The Judges pronounced their opinions.
JUDGE TUCKER.
This is a bill to set aside 'a conveyance of lands and negroes, made the 20th of February, 1783, by William Howell to his cousin John Clanton, both deceased, on the grounds stated in the bill.
The bill states, that “Howell, from the time of his birth to the time of his death, laboured under a lamentable and invincible weakness of understanding and intellect, which rendered him absolutely incapable of regulating his own affairs, and classed him, with propriety, among those who are called idiots;” that this was universally, known, and assented to, by all who knew him; that, soon after he arrived at the age of twenty-one, his cousin John Clanton, to-whom his situation had been long and perfectly known, induced him, although he had a sister then living, who is one of the complainants, to execute a deed, for all his lands and slaves, as his absolute property and estate, for the incompetent consideration of finding and providing for him sufficient and plentiful meat, drink, washing, lodging and clothing, in a comfortable and plentiful manner, during the said Howell’s, life, or remaining abatchelor; as will more fully appear by the deed, in which there is. the following clause, not mentioned, or in any way noticed in the bill; “Provided nevertheless, and it is hereby agreed on by and between the parties to these presents, to be the true intent and meaning of these presents, that, in case the said William Howell shall hereafter intermarry, that the estate above conveyed, as well land as slaves, with the increase of the said slaves, shall revert unto the said Howell and his wife, during their joint and several lives; and, in case the said Howell shall have lawful issue, that the said estate, and every part thereof, shall be subject to his disposal among them, by deed or will; or, in case of his failing to make such distribution, then it shall pass, and go, and descend agreeably to the act of Assembly, in case of his dying intestate; but if no such issue, the same to revert to Clanton and his heirs, after the death of Howell and his wife.” The bill then proceeds to state that, after this deed had been thus fraudulently obtained from an unfortunate and wretched being, who was ignorant of its operation, the said Clanton having had the same, after several ineffectual attempts, proved and recorded, treated Howell as a vagabond and outcast, and a slave; and, in 577 *order to manifest, more plainly, the palpable and infamous fraud practised on this occasion by the said Clanton-, the complainants aver and offer to prove that the deed above mentioned when offered, at first and several times after, to the Court for probate, was rejected by the Court, and not permitted to be recorded, from their individual knowledge of the facts before stated; and after stating some other circumstances not material to be noticed in *229 this part of the cause, they pray that the Court may declare and render null to all intents and purposes the aforesaid fraudulent deed, &c.
The answer of Sarah Whitehorn, who was the wife of John Clanton, saith, that the complainants are very much mistaken in the representation which they have made; that Howell was about nineteen or twenty when his mother died; and she avers that, for several years before his mother’s death, he had been afflicted with sores and ulcers which sometimes covered a great part of his body; that he continued in that situation, or worse, until he died, which was about the year 1789; that, when the ulcers dried, as they occasionally did, his bodily pains and afflictions seemed to increase. She believes that the ulcers rose inwardly, because there were frequent discharges of matter from his mouth and nose; which will account for his unsightly appearance, and the society in which he might sometimes been seen: that he was afflicted in this way when he came to live with her deceased husband Clanton; that, when at home, he always dined with the family when he pleased, and was lodged as comfortably as his diseased condition would admit; that he Was not an idiot, as the complainants suppose. It is true that, from continued and excessive affliction, his mind was impaired ; but he generally had understanding enough, not only to preserve his person from mischief, but to converse rationally and sociably, and to guard against any decepition or advantage which others might be disposed to take of him. She further saith, that the said William proposed to the said John to make such a conveyance as is •contained in the deed, several times before it was actually executed; that that deed, as well as the one which the complainants alluded to as having been rejected when offered for record, is attested by David Mason ; that which is dated the first of October, 1783, (which is admitted by consent, and appears at the end of this record,) was not recorded, because, as she has been told, it was thought to be informal, ¿78 *and not because there was any suspicion of advantage. She adds; that the bargain was, in her estimation, a proper one, because the confinement, to which his disease often condemned him, would have made it inconvenient, if not impracticable, for him to manage his estate.
About two thirds of the witnesses (of whom there are near thirty) testify either their own, or the general opinion of the neighbourhood, that Howell was a person of extremely weak intellect; but it was conceded by the appellees’ counsel that there is no proof that he was an idiot. The rest of the witnesses corroborate the account given of him in the answer. There is, however, this obvious distinction between the answer and the depositions taken in support of the bill. The answer states facts; the latter, in general, opinions only. If it be objected, that the answer is not entitled to the same credit as the deposition of a witness, who is supposed to be disinterested ; there are circumstances apparent upon this record, that, in my opinion, place this answer, in point of credibility, upon very high ground. Hirst, it is perfectly responsive to the bill, and stands uncontradicted even by a shadow of evidence, in a most material point, which I shall hereafter notice. Secondly, it appears from the will of John Clanton (among the exhibits) that his widow, upon her marriage with the defendant Whitehorn, forfeited every provision made for her in Clanton’s will. She, therefore, is presumably a defendant without interest in the cause, whose answer, where it is responsive to the bill, is thereby entitled to the utmost credit; especially, where it stands uncontradicted as to the fact alleged.. It states, then, in my opinion, in a very candid manner, a good and sufficient inducement to the contract on the part of Howell. Helpless and forlorn, as he appears to have been, from the whole current of the testimony, it was certainly an object with him (if he had any intellect at all) to secure to himself, during his miserable existence, 1 ‘sufficient and plentiful meat, drink, washing, lodging, and clothing, in a comfortable and plentiful manner.” These are the cogent inducements to the bargain, and some of the considerations (and certainly the principal) mentioned in the deed. That he possessed sufficient intellect to know this, appears not only from what passed between himself and Mrs, Mason, when he came to her husband to draw' the deed; but from his subsequent complaint to Robert Jones, one of the complainants’ witnesses, “that Clan-579 ton *"did not use him well; and from the large offers which he made to Jones, if he would get his estate from Clan-ton for him.” But a farther and more convincing proof that he was not a person of such weak understanding as not to know what he was about, when making a bargain, appears from the singular and uncontradicted fact of his taking a journey by himself, (as far as appears to tne contrary,) to the house of James Nicholson, in North Carolina, where his sister (one of the complainants) lived, for the express purpose of giving her three instead of two negroes, which his mother, by her will, had required of him to give that sister, before he should be entitled to any part of the mother’s estate. The bond of relinquishment which he took from his sister on that occasion, was drawn by John Haulcon, of North Carolina, and executed at Nicholson’s house, where she resided, and attested by Nicholson, his wife, and a third witness. Not a syllable is heard of Clanton on this occasion ; and, yet, this very transaction is imputed to him as an evidence of fraud, although neither charged as such (nor even hinted at) in the bill, nor mentioned by any other of the witnesses. This transaction, therefore, as it appears by this record, is conclusive evidence, that Howell was neither an idiot, (as the charge in the bill imports,) nor yet a person of such weakness of intellect, as not to be able to understand the nature of his own interest, or of any bargain he might be about to contract.
But it is insisted, that an advantage was taken of him by his relation Clanton, immediately, or very soon after he came of age; and, although weakness of under *230 standing alone may not be sufficient to set aside a contract fairly made, and for an adequate consideration, yet,- when it is coupled with such a circumstance as that just mentioned, or with previous dependence; (as appears to have been the case, in some degree, at present;) or with trust and confidence; or with unbounded influence; or with gross inadequacy of price or consideration ; or with extreme distress of situation ; or with the pretermission of an unoffending sister, who was his nearest relation and heir; that a Court of Equity, will rescind tlie contract.
I shall not enter into a minute discussion of all these several points, all which I conceive to be put completely out of the question, either by the facts apparent - in the record in support of the defendants’ right, or the want of such facts on the part of the complainants; or the want of charges 580 in the bill upon some of *these subjects. The only direct charge in the bill (except that invincible weakness of understanding, of which there is no proof) is, that Clanton induced Howell to execute the deed for the incompetent consideration therein mentioned. Now the answer of Sarah Whitehorn (which is expressly responsive to this charge of Clanton’s inducing Howell to execute the deed) states, “that Howell proposed to Clanton to make such a conveyance several times before it was actually executed.” There is not a scintilla of evidence to the contrary in the whole record: on the contrary, Mary Mason’s testimony may well be considered as 'corroborating this assertion in the answer. Neither Howell’s supposed youth, nor previous dependence, nor his trust and confidence in Clanton, which seem rather to have sprung from his affection and a sense of gratitude, than from any other cause, nor his unbounded influence, (of which there is no sort of proof,) can derive any strength, in opposition to this uncontradicted testimony, so perfectly responsive to the most material charge (except idiocy) in the bill.
I shall therefore proceed to the inadequacy of consideration, as the next subject of inquiry.
Neither the value of the land, nor that of the negroes, is stated in the bill; nor in either of the answers; nor in any of the depositions, that I can discover. An obvious reason for the omission in the latter appears to be, that it was not put in'issue by the former. The Commissioners appointed by the Court of Sussex County to state an account of the reasonable hire of the slaves mentioned in the deed, (from the time of the death of Howell to the time of their report,) and to report the sum for which the lands were sold, (by Howell and Clanton jointly, as appears from one of the answers, though neither the consideration money, nor the person to whom the same was paid, or, if to both, in what proportions such payment was made, anywhere appears,) have furnished some data by which a conjectural estimate of the actual fee-simple value of the lands, when sold, and the annual worth, or hire of the slaves, during the .whole period that elapsed between the date of the original deed in October, 1783, and the date of the Commissioners’ report, the 1st of October, 1804, a period of one and twenty years, may be guessed at. They state the sales of the two tracts of land, containing, as alleged in the bill, 264 acres, at 1451.; which is just eleven shillings an acre. They estimate the negro- hire for the year 1789, due 581 January 1, *1790, nothing. This might be because Howell died late in 1789; but whether it were so or not does not appear; nor are we informed when he died. The next year we find the value of their hire (reasonable deductions for their maintenance and support being first made by Commissioners) charged at six pounds. The next year 121. 17s. 6d., the third year, 191. 9s. Id. 3-4; the average value of those three years being 121. 15s. 6d. 1-2 per annum : but, if the year 1789 ought to be taken into the account, (as it would seem, from the Commissioners’ thinking it necessary to notice that year,) the average value of the slave hire, after making due deductions for the support and maintenance of such as were young and chargeable, for those four years, was only 91. 11s. 7d. 3-4. Taking it, however, at the highest average, and adding thereto the interest of 1451., for which the lands were sold, amounting to 71. 7s. 6d. more, the average value of Howell’s whole annual income for those three years amounts to 20i. 3s. Od. 1-2. But we have no reason to rate it so high, at any period during his life. Eor the value of the slaves being only 61. the first (or second year) after his death ; upwards of 121. the succeeding year; near 201. the next; and, so on, graudually increasing from year to year, till we find it valued to 371. 4s. 6d. in 1802, which is the highest estimate of the whole; we are well warranted in supposing that the greater part, or the whole of them, consisted of young negroes, who were either chargeable, or, at most, not very profitable. Taking it either way; and, even supposing the annual profits of Howell’s estate, at that time, to have been equal to 201. 3s. the average for those three years, I should not deem that sum, by any means, a sufficient consideration, for the comfortable and plentiful accommodation and support of a miserable object, such as Howell is described to have been.
Objection. That it was not the yearly value of the lands and negroes only that Clanton was to have by this deed, as a consideration for the maintenance of Howell; but the absolute property therein.
Answer. That is not the case. If Howell had married, the annual profits were all Clanton was to have till the death of Howell and his wife both; and, if he had lawful issue, the property was gone from him for ever. And, though it may be supposed the chance of Howell’s marriage was not great, yet he was free to do so, and 582 *thereby to put an end to the present, and, possibly, to the future interest and hopes of Clanton; who had during the life of Howell, no more than an estate upon an express condition in deed, which it was in the power of Howell to avail himself of at any moment, and thereby defeat the estate, if he thought proper so to do.
Objection. Howell was not supported and *231 maintained in the manner he ought to have been by Clanton. This, if true, might have been some ground for an application to a Court of Equity by Howell, in his life-time, either to rescind the contract, or to compel Clanton to pay him a stated allowance for his support, as, from all the circumstances of the case, might have been most proper: but it furnishes no ground for the representatives of Howell to apply, at this time of day, for the rescisión of a contract, the beneficial provisions of which terminated, on his part, with his life. If the person to whom he complained that Clanton did not use him well, had applied to a Court in his behalf, to permit him to sue in forma pauperis, the case might have appeared such as to entitle him to some relief; but, what it ought to have been, this Court cannot, at this time, bjr any possibility, judge. It appears to me, therefore, that there is neither a gross inadequacy of consideration, nor, under all the circumstances of this case, any inadequacy of consideration at all. Neither is there any evidence in this record, of any advantage being taken, by Clan-ton, of the extreme distress of Howell, nor of his exerting, at any time, any improper influence over him; nor is there, that I can perceive, the smallest proof of fraud, or any undue practice whatsoever on the part of Clanton; unless we are to presume it from the face of the deed itself, which has not even the slightest colour of it, in it; or, unless we infer it from what has been said of Howell’s complaints of not being well used, which the answer of Sarah White-horn, and the depositions of several of the witnesses to the same effect, render questionable at least; and certainly, those complaints, if true, fall very far short of establishing a charge of fraud, unless we were to denominate every breach of a positive contract, a fraud; which no Court of Equity has yet ventured to do, that I know.
I have preferred considering this case upon the real merits, as it appears upon the face of the record, to an investigation of the practical points which have been argued at the bar; because I would never wish to reverse a decree of a Court of Chan-£83 eery, upon *any other ground than the merits of the cause, where they can be fairly got at. In the present instance, my opinion is, that both decrees be reversed, and the complainants’ bill dismissed with costs.
But if the complainants were entitled to a decree in their favour, I am still of opinion that the present decree is erroneous.
My first objection to the present decree is, that the Commissioners have allowed interest on the hire of the slaves, from year to year, from "the period of Howell’s death, to the day of making their report.
In giving my opinion in the case of Dilliard v. Tomlinson, this term, I stated several instances, where I thought an executor or administrator could not be chargeable for interest upon money, actually received by him. Much less with interest upon the hire of slaves, which, peradventure, he may never have received, or not for several years after it became due. I beg leave to refer to what I then said, as containing my deliberate opinion, and the reasons for it.
Objection. The report states that the same was made in the presence, and with the approbation, of the defendants.
That is not the case. Sally Whitehorn, wife of one of the defendants, and Nathaniel Chambliss, who acted as special guardian to the infant defendants, are stated to have been present. But the executors are neither stated as being present, nor even as having notice to attend. The consent of the others, who were present, therefore, cannot possibly affect the executors. Neither (I presume) could Whitehorn be affected by the consent of his wife, unless it were proved she acted as his attorney, under a special power and authority from him. Nor will this Court, sitting as a Court of Equity, suffer the interest of infants to be committed, by a careless or ignorant guardian ad litem. And I must be permitted to doubt whether a Court of Equity ought ever to sanction the report of its Commissioner, when he mistakes the law; although the parties may submit to his decision, without filing any exception to his report. Eor his office is to state facts for the consideration of the Court; where he undertakes to do more, I conceive that his report is no less open to impeachment for error than the decree of the Court, proceeding upon a mistake in law, is. For a contrary doctrine would be putting the Commissioner’s report, in point of legal obligation, upon higher ground than the decree of the Court itself. Upon these 584 grounds, I think *the charge of interest on the hire of the negroes is utterly erroneous; for this suit was not brought till near eleven years after Howell’s death, and, until a very short time before it was brought, there was no administrator to whom any debt due to him from any person whatsoever could be paid or tendered. The legal right in the slaves being in the executors of Clanton ; had there been an executor of Howell, how could Clanton’s executors have been justified in paying them for the negro hire, until the decree should fix their right to demand it. How then are the executors to be made chargeable for interest upon money which they had no right to pay? The most that equity can do, as to make them accountable for the hire of the slaves, free of interest upon that hire.
But here a question occurs. From what period are the executors to be charged with the hire, if, indeed, in this case, they are chargeable at all?
John Clanton died before the second of September, 1790; this suit was not brought until April, 1800. Burwell Eoften and Michael Bailey, who qualified as his executors, were at that time both dead; Michael Bailey, the surviving executor, had, before his death, fully closed and returned to the Court his accounts as executor of Clanton, as is positively stated by the defendants, J. C. Bailey, and Benjamin Wyche, his executors, in their answer; to which there was no replication, that I can discover; nor are there any depositions taken which bear any relation to this fact. So that the answer, if not actually admitted *232 to be true, in all its parts, stands uncontradicted in this particular. If Michael Bailey, the surviving executor, had been alive when the suit was brought, and had put in an answer to the same effect as that of his executors; and the cause had been heard in the same manner as it was; the bill against him (I conceive) ought to have been dismissed. Ror, surely, when an executor has settled all claims against his testator’s estate, (of which he had no notice,) and has settled his accounts with the Court which granted the probate of the will, and made distribution, he ought not to be affected by any dormant equitable claim, which may rise up against his testator’s estate, at any distance of time afterwards. Much less ought his executors, who, under such circumstances, cannot be supposed to be conusant of the affairs of the first testator, as the present defendants expressly state in their answer. And, yet, the S8S decree **in the present case must be understood as against them for nearly 8001. 'On this ground, therefore, I consider the decree as palpably erroneous.
Objection. Clanton appointed his wife Sarah (now the defendant Sarah Whitehorn) his executrix, together with Eoften and Bailey, his executors. '
But she did not qualify; they did; and, on her marriage with Whitehorn, which was previous to the commencement of this suit, she forfeited every benefit under her husband’s will. And it does not appear that she renounced the will, nor that she ever qualified as Clanton’s executrix. The decree, therefore, which, in its terms, imports to direct the executors -of the said John Clanton, “out of his assets in their hands to be administered, to pay to the complainants the money reported by the Commissioners to be due, for the hire of the slaves, and the sale of the land,” must be understood (I conceive) as against the executors of the surviving executor of Clanton.
Objection. The executors, before distribution, made, ought to have taken an indemnifying bond of the distributees to answer any future debts or demands against the testator’s estate.
I do not know that the law requires this of an executor. In the case of an administrator, the law will not compel him to niake distribution, until bond with security be given, by the distributees, to refund their proportional parts of any future debt or demand against the estate. This is a security which the law gives to the administrator; but as it does not give it to the executor, and as he is bound to perform the will, I am not prepared to say that he can refuse to pay a legacy, or to make distribution of the residuum, unless the legatee or distributee will give him a similar bond. Walden v. Payne(a) is to that effect. Be that as it may, the complainants in this cause have followed the effects of Clanton into the hands of his children,(b) and for aught that appears to the contrary, they are the proper persons, not only' to make restitution of the slaves, but compensation for their hire. The question then recurs, from what period ought they to be charged with it. And my opinion is, that they ought not to be charged with the hire of the slaves, or with the interest on the sales of the land, until the commencement of this suit. Por, first, this is a dormant equity, of which these defendants, who are infants, cannot be presumed to have had any notice; nor, if they £>86 *had, could they, or their guardian in their behalf, have given up the slaves or paid their hire. Por neither the infants themselves, nor their guardian, were competent to do this of their own mere motion, without the authority or direction of a court. Secondly, they could not know to whom to make restitution or payment; there being no legal personal representative of Howell until a short time before the suit brought. And surely, there is as much reason to adopt this rule, in this case of a dormant equity against infants, as in the case of a widow who come into a Court of Equity to demand her dower; in which case the rule seems to be, that she shall not be allowed for the rents and profits which accrued previous to the filing of her bill; although, at law, she is entitled to recover damages, equal thereto, from the time of the husband’s death until the day of the judgment, whereby she recovers seisin of her dower, (c)
Admitting, then, that the complainants are entitled to a decree in their favour, this decree appears to me to be manifestly erroneous, for the reasons last mentioned. It ought, therefore, (in any event,) to be reversed, I conceive, and sent back to be reformed by the Court of Chancery, agreeably to the preceding principles.
JUDGE ROANE
observed, the case appeared to him so plain on the testimony and principles of law, that he did not think it necessary to give a detailed opinion. He then read the decree of the Chancellor, and said; so far the decree relates to and decides upon the principles of the cause, and I can only say, that, on examination of the record, most, if not all, the positions taken by the Chancellor are correct. If the decree, so far as it respects the account, defended upon the report only, perhaps I might not be disposed to sanction it; on account of the incompetency of some of the parties to consent before the Commissioners ; but it appears from the decree of the County Court that the defendants not only made no objection, but approved of the report. (1) With respect to interest on *233 587 hire of negroes, I cannot *conceive it to be improper on general principles. Negroes are generally hired, taking bonds payable at the end of the year; which bonds carry interest, if the money be not paid; and “it is natural justice that he who has the use of another’s money should pay interest for it.” (a) I should therefore be of opinion to affirm the decree in omnibus, except (the executors having, perhaps, parted with the estate) to correct it so as to make the property liable in the hands of iiic legatees.
JUDGE FLEMING.
With respect to the principal point in controversy, to wit, the invalidity of the deed from Howell to Clanton, I have no doubt, for the reasons stated in both decrees of the Courts. 1. The extreme weakness of intellect and want of capacity in Howell, (though not a prefect idiot,) manifested by the depositions of a number of witnesses, who were acquainted with him from his early infancy, and, particularly, the rejection of the first deed (offered to be recorded in Sussex Court) from the magistrates’ personal knowledge of the imbecility of Howell’s mind; 2. The consequent undue influence Clanton had over him, which appears through the whole course of the transactions; and especially in his prevailing on him to join in the absolute sales of the land to Milner and Micajah Hines, in October, 1786; when a principal and most important covenant in the deed of 1783 was, “that in case the said William Howell should thereafter intermarry, that the said estate above conveyed, as well land as slaves, with the increase of the said slaves (if any) should revert unto the said William Howell and his wife, during their joint and several lives,” &c. And, if such an event had taken place, after the sales in 1786, he would not have had a hovel to shelter his wife from the inclemency of the weather; 3. The inadequate considerations in the deed; besides Clan-ton’s subsequent harsh and ungenerous treatment of Howell, very different 588 from what was '^stated as a consideration therein. It was, however, contended by the appellants’ counsel, in the argument, that that circumstance, if true, ought to have no influence with the Court: but, to me, it appears a circumstance among many others, to shew that the principal object of Clanton was to secure to himself the estate, and, after he had effected his purpose, he cared very little what became of Howell himself; which, in a case like this, has, I confess, considerable weight with me.
But it appears to me that the decree is erroneous in allowing interest on the hire of the slaves; and, on that ground, the decree in the case of Dilliard v. Tomlinson was lately reversed in part, by this Court: and the reasons fo'r disallowing the interest in the case before us appear much stronger than in that case. Here the slaves came to the possession of infants under the will of their father, John Clanton, upon the marriage of his widow Sally Clan-ton with the appella'nt Whitehorn, several years (but how long doth not appear) before the_ commencement of this suit; and, though I am of opinion that those who have had the benefit of the negroes’ labour, ought to pay a reasonable hire for them, they ought, according to precedents of this Court, and especially in this particular case, to he exonerated from the payment of interest, as it does not appear that the negroes were ever actually hired out; and the contrary is to be presumed; but the Commissioners justly thought proper to charge a reasonable hire for their labour in the possession of the legatees, under John Clanton’s will.
I have, also, a doubt with respect to the correctness of the decree in ordering that the executors of John Clanton do, out of his assets in their hands to be administered, pay to the complainants the sum reported to be due for hire of slaves, &c.
It appears by the record that John Clan-ton, who died before the 2d of September, 1790, appointed two executors who qualified, and that the survivor of them (Michael Bailey) died, and made the defendants Benjamin Wyche and James C. Bailej7, his executors; who, in their answer, say, that their testator, the surviving executor of John Clanton, had, previous to his death, fully closed and returned to Sussex Court a statement of his executorial accounts, and conceive that the complainants have no cause of complaint against them; they being entirely ignorant of any fraud or iniquity, and pray to be dismissed with their costs, &c.
*As it appears also, from this answer, that no part of John Clanton’s estate ever came to their hands, their testator, as surviving executor of Clanton, having closed and returned his executors’ account to Sussex Court many years before the commencement of this suit, can it with propriety be said that they have in their hands any assets of John Clanton unadministered to pay the sum of money decreed to the complainants?
It seems to me, therefore, that an account ought to be taken, and that the legatees of John Clanton pay their ratable proportion of the money due, for hire of negroes, and on the sales of the land, with interest at 5 per centum per annum, on the latter from the death of William Howell to the time of payment.
The following was entered as the decree of the Court. “A majority of this Court is of opinion, that the said decree of the Superior Court of Chancery is erroneous in affirming the decree aforesaid of the said County Court, whereby it was adjudged and ordered that the appellants, executors of the said John Clanton, deceased, out of his assets in their hands to be administered, should pay to the appellees the sum of 7721. 17s. 11d. 1-2 it appearing by the report of certain Commissioners appointed by a decretal order of the said County Court of Sussex, made the 4th day of February, 1803, to make up and state an account to the Court of the reasonable hire *234 of the slaves, named in a deed in the proceedings mentioned from the death of the said William Howell to the time of their report, that the sum of 1031. Is. 2d. 3-4 part of the said sum of 7721. 17s. lid. 1-2 reported by the said Commissioners to be due from the appellants to the appellees, was charged for interest on the hire of the said slaves from the 1st day of January, 1791, until the 1st day' of October, 1804; which said report was approved and established in the whole by ,the said County Court. Therefore it is decreed and ordered, that the decree aforesaid of the said Superior Court of Chancery be reversed and annulled; and that the appellees, administrators of the said William Howell, out of his goods and chattels in their hands to be administered, if so much thereof they have, pay to the appellants their costs in this Court. And this Court proceeding to make such decree as the said Superior Court of Chancery ought to have rendered; it is decreed and ordered that the decree aforesaid of the said County Court 590 be reversed *'and annulled;” “and that the appellees, administrators of the said William Howell, out of his goods and chattels in their hands to be administered, of so much thereof they have, pay to the appellants their costs in prosecuting their appeal in the said Superior' Court of Chancery. And it is further decreed and ordered that the appellants, in whose possession the slaves in the bill mentioned are, do deliver the said slaves and their increase to the appellees. And, it appearing to this Court by the answers of the defendants Benjamin Wyche and James C. Bailey, executors of Michael Bailey, deceased, who was the surviving executor of the said John Clanton, deceased, that their testator had, previous to his death, fully closed and returned to Sussex Court a statement of his executorial accounts, (which answers, not having been denied nor replied to, must be taken as true,) it is therefore presumed that the said defendants, executors of the surviving executor of the said John Clanton, deceased, can have none of his assets in their hands to be administered. It is therefore further decreed and ordered, that an account be taken of the legacies bequeathed to the other defendants by the last will of the said John Clanton, deceased, and that the said legatees pay to the appellees their respective ratable proportion of the balance of the said 7721. 17s. lid., 1-2, after deducting the said sum of 1031. Is. 2d. 3-4 charged in the Commissioners’ said report for interest on the money due for the hire of the slaves. And the cause is remanded to the said Superior Court of Chancery for further proceedings to be had therein, agreeably to the principles of this decree.”

 2 Wash. 7.

 Vid. Burnley v. Lambert, 1 Wash. 312.

 1 Rev. Code, c. 94, s. 4.

 Note. In a subsequent case of Clarke and White, Executors of White v. Johnson and others, June 12th, 1811, the Court (consisting- of Judges Roane, Brooke, and Cabell) unanimously decided, that reports of Commissioners, which are not erroneous upon the face of them, shall not be impeached in an appellate Court, (where not specially excepted to in the court below.) “on grounds, or in relation to subí ects, which maybe affected by extraneous testimony.” In that case the question was, whether interest ought not to have been charged against White’s executors, in the settlement of their administration account by Commissioners, in a suit brought against them by the legatees. The Commissioners made no charge of interest; (without assigning any reason;) and. no exception being taken to their report, the County Court decreed accordingly. The ¡Chancellor reversed that decree, and allowed interest against the executors. But this Court reversed his decree, and affirmed that of the County Court; declaring, in the decree of affirmance, “that *233 the report, so far as It related to the interest claimed against the appellants, was ot a nature to he affected by extraneous testimony, and. not being-objected to, was conclusive between the parties.” - Note in Original Edition.

 2 Call, 102, Jones v. Williams.